[Cite as *State v. Kimmie*, 2013-Ohio-4034.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 99236**

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# TYSHAWN KIMMIE

DEFENDANT-APPELLANT

## JUDGMENT:
## AFFIRMED IN PART; REVERSED IN PART

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-560898

**BEFORE:** McCormack, J., Stewart, A.J., and Keough, J.

**RELEASED AND JOURNALIZED:** September 19, 2013

**ATTORNEY FOR APPELLANT**

Joseph Vincent Pagano
P.O. Box 16869
Rocky River, OH 44116


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Kevin R. Filiatraut
Daniel A. Cleary
Assistant County Prosecutors
8th Floor, Justice Center
1200 Ontario Street
Cleveland, OH 44113

TIM McCORMACK, J.:

{¶1} Defendant-appellant, Tyshawn Kimmie ("Kimmie"), appeals his convictions for reckless homicide, murder, two counts of felonious assault, and firearm specifications. For the reasons that follow, we affirm Kimmie's convictions, but we reverse the trial court's sentence and remand for resentencing consistent with this opinion.

**Procedural History**

{¶2} On April 10, 2012, Kimmie and codefendants, Jontez Robinson and Kenneth White, were charged with aggravated murder in Count 1, murder in Count 2, and felonious assault in Counts 3 and 4, along with firearm specifications. The felonious assault charges also carried a criminal gang specification.

{¶3} On October 10, 2012, Kimmie filed a motion to suppress his post-arrest oral statement to the police. The trial court heard Kimmie's motion on October 15, 2012, and, thereafter, denied the motion on October 17, 2012. Following Kimmie's rejection of any plea discussions, a jury trial began on October 17, 2012. The jury found Kimmie guilty of a lesser included offense of Count 1 — reckless homicide, murder of Danica Nelson in Count 2, two counts of felonious assault, and the firearm specifications. Upon Kimmie's Crim.R. 29 motion for acquittal, the court dismissed the criminal gang specifications of Counts 3 and 4.

{¶4} The trial court sentenced Kimmie on November 2, 2012, to 15 years to life on Count 2 (merging Count 1 into Count 2 for sentencing purposes), three years on Count 3, and three years on Count 4. The court ordered all counts to run consecutively and consecutive to the three-year firearm specification (merged), for a total of 24 years to life. Kimmie objected to the court's imposition of consecutive sentences. Thereafter, Kimmie filed this timely appeal.

## Substantive Facts

{¶5} Kimmie's convictions arose out of events that occurred following a back-to-school party held in the area of Longwood Ave. and East 36th Street in Cleveland, on August 26, 2011.

{¶6} In support of the charges, the state presented at trial the following evidence against Kimmie: security officer James Morgan's ("Morgan") testimony that the shooter, who was shooting toward E. 39th St. and Longwood Ave., was wearing a red jacket; state's exhibits Nos. 193 and 194, which contain front and back view photos of a distinctive hooded red, black, and white jacket, identified by Morgan as the jacket worn by the shooter; Morgan's testimony that the shooter with the red jacket threw the gun at Morgan; state's exhibit No. 232, referred to in trial as "the Kimmie weapon," which was identified by Morgan as the gun the shooter in the red jacket threw at him; security officers Drummond's and Tate's testimony confirming shooting from the van in the area of E. 38th St. and Longwood Ave.; expert testimony that both the red jacket and the gun tested positive for Kimmie's DNA; the 16-year-old victim, K.J.'s, out-of-court and

in-court identification of Kimmie as the shooter; expert testimony that the "Kimmie weapon" had fired six shots; Lizaria Moore's testimony identifying the red jacket as belonging to one of the boys in the area from where she heard gunshots; Raynell Williams's testimony placing Kimmie at the scene prior to hearing gunfire; and Kimmie's own statement in which he admitted shooting at the "Valley Boys."

TD Security

{¶7}   The area of Longwood Ave. and E. 36th St., where the party was held, was patrolled by TD Security.  James Morgan, a security officer with TD Security, testified that he and other security officers were patrolling the area on the evening of August 26, and they broke up the party about 11:00 p.m.

{¶8}   Morgan testified that while helping a stranded motorist in the area at approximately 1:00 a.m. on August 27, he heard shots fired about 50 feet away from where he and the other security officers were situated on the north side of E. 38th St. Among those shots, three or four were fired close to the security officers.  Morgan and the other security officers, Victor Drummond ("Drummond") and William Tate ("Tate"), ran toward the area of the gunfire.  Morgan saw two to three shooters standing behind a black van in a parking space on the corner of E. 38th St. and Longwood Ave.  The shooters were standing on the north side of the van, leaning around the van and shooting into a crowd, southeast, toward the area of E. 39th St. and Dillard Ave.  Morgan could not identify the object at which they were shooting, but he stated the shooters "were trying to fire at something."

{¶9} Morgan identified one of the shooters as wearing a white cap, a red and white jogging coat, and dark colored jeans, "somewhat skinny * * * maybe roughly 160, 170 pounds." He had a gun cocked to the side, like a "gangster," and he was shooting toward the sidewalk on Longwood Ave. Morgan saw another individual near the van who was "a little bit shorter, a little bit heavier, * * * probably 180, 190," wearing a black t-shirt and "light colored jeans, possibly shorts."

{¶10} Morgan heard constant firing from Longwood Ave. at E. 38th St., where he and his partners were situated. He focused on the shooter wearing the red jacket and screamed for the shooter to drop his weapon. The shooter in the red jacket ran toward Morgan, threw his gun at him, and ran away, toward the Bivens courtyard. Morgan picked up the discarded gun and locked it in his patrol car.

{¶11} Drummond and Tate also testified that they saw an individual shooting from the area of the van, on the corner of E. 38th St. and Longwood Ave., near the security officers. Tate saw one person shooting and one person holding a weapon. The person shooting from behind the van was "blindly firing into a crowd." The first shots he heard were fired from E. 38th St. and Longwood Ave., toward Dillard Ave. and E. 39th St., and then there was return fire from Dillard Ave. Tate saw two shooters, one with dark clothing and the other with a "light colored hat on." The shooter "with the dark bottom * * * [and] lighter hat" threw his gun at Morgan. Drummond testified that he saw the male with the white hat run through the courtyard entrance. The other male who was running from the area, "down 38th [street]," was wearing a red top. Tate confirmed on

the stand that he recognized the following images taken from TD Security's surveillance video (state's exhibit No. 247) on the night of the shooting: the van from where the shooting had come, one of the shooters shooting his weapon, and the Bivens courtyard toward which four individuals had run.

{¶12} After the shooters ran off, Morgan, Drummond, and Tate proceeded to the area of Longwood Ave., where they heard there were shooting victims. The security officers observed gunshot wounds to James Willingham's foot, K.J.'s wrist, and Danica Nelson's head. Morgan himself saw shell casings "everywhere," including a few to the east and west of Danica Nelson's lifeless body, and "a lot [from] where the black van and * * * the shooters" were shooting.[1]

{¶13} Morgan saw Nelson lying in the area toward which the shooter in the red jacket had been shooting. He identified state's exhibit No. 232 — a Star .9mm caliber pistol — as the handgun that the shooter in the red jacket had thrown at him before running away and the same one that he had locked in his patrol car. Morgan also identified state's exhibits Nos. 193 and 194 as photographs of a red jacket like the one he saw the shooter wearing. While Morgan testified that he saw the face of the shooter wearing the red jacket, he could not identify the shooter from the police photo arrays with "100 percent certainty." Morgan did not know who fired the first shot.

---

[1] Detective James Kooser, the state's firearms expert, explained to the jury that a cartridge case (or casing) consists of four parts: bullet, cartridge case, primer, and gunpowder. He further explained that the cartridge case is the part remaining after firing a gun, stating that the cartridge cases "fly all over wherever you're shooting, all over the crime scene," leaving evidence of the shooting.

## The Red Jacket

{¶14} Police officer Frederick Beverly was dispatched to perform crowd control duties during a vigil held for Danica Nelson a day or two following the shooting. Beverly testified that during the vigil, a young lady handed him a plastic bag with a red jacket inside. Beverly identified state's exhibits Nos. 193 and 194 — photographs of the red jacket James Morgan testified the shooter who threw the gun at him was wearing — as that same jacket.

{¶15} Curtiss Jones, supervisor of the trace evidence department at the medical examiner's office, tested the jacket identified above as state's exhibits Nos. 193 and 194 for gunshot residue. He found three particles characteristic of gunshot primer residue on the right sleeve of the jacket. He removed samples from the hood and sleeve cuffs of the jacket in order to submit them for DNA testing.

{¶16} Dr. Nasir Butt, director of the DNA laboratory at the Cuyahoga County Regional Forensic Science Laboratory in the medical examiner's office, tested the swabs of DNA collected from the red jacket. He determined that Kimmie cannot be excluded as a possible contributor to that mixture.

## The Kimmie Weapon

{¶17} Detective Michael Gibbs, a detective in the crime scene unit of the Cleveland Police Department, processed the crime scene in the early morning hours of August 27, 2011. He swabbed the collected items, which included the handgun retrieved by Morgan and identified in trial as "the Kimmie weapon," for DNA evidence.

{¶18} Dr. Butt tested the swabs of DNA collected from the weapon. He found Kimmie's DNA on the trigger and the back strap of the gun. He testified that the probability of finding an unrelated individual at random from the public "as a possible source of the major DNA component obtained" from the back strap of the gun is one in 94 million in African-Americans. Dr. Butt referred to Kimmie as "the major contributor" of the DNA. With respect to the trigger of the same gun, Dr. Butt found the DNA to be a mixture of two individuals, of which Kimmie is a "possible contributor."

### K.J.'s Testimony and Identifications

{¶19} K.J., who was shot in the wrist, testified that she attended the back-to-school party in the area of E. 36th St. and Longwood Ave. with Danica Nelson, Lizaria Moore, and K.J.'s sister, Demetria Linder. After they left the party, K.J. and her friends went to Longwood Ave., where they were standing around and talking. Nelson sat on the curb with Moore and another girl. K.J. heard an initial shot coming from Dillard Ave. going toward E. 38th St. "and then a lot [of shooting] started coming from E. 38th" toward their location.

{¶20} When K.J. heard the shots, she ran and hid under a white car, while Nelson and Moore lay on the ground under a tree. K.J. said her head was pointed east toward Dillard Ave. and her feet were pointed west toward E. 39th St. While K.J. was under the car, she looked up and saw one of the shooters shooting toward Dillard Ave. She saw the shooter point his gun straight out and not in the air. When she realized Nelson had been shot in the head, she placed her purse near the wound in order to stop the bleeding.

{¶21} K.J. testified that the shooter was "about 19 or 20 years old, brown skin, short haircut," about 5'3" or 5'4", wearing a black shirt and denim pants, and she had seen him earlier that evening at the party. While K.J. initially told police that she could not see the shooter's face, she stated in court that she meant that she could not see any facial hair or tattoos. K.J. identified Kimmie as the shooter in a police photo array and also in the courtroom.

### Crime Scene Evidence

{¶22} Detective Lem Griffin, the lead investigator in this case, testified that, based upon statements he obtained, he arrested Kimmie, who goes by the name "T.Y.," in connection with the homicide.

{¶23} Griffin testified that there were two sets of people, or two locations, involved in a "shoot-out," as evidenced by the shell casings discovered in both locations. These locations were E. 38th St. – Longwood Ave., where "numerous" casings were found, and Dillard Ave. – Longwood Ave., where "maybe a couple shell casings or a bullet" were discovered. Griffin testified that Nelson was shot at 3914 Longwood Ave. According to Griffin, the angle from which Nelson was shot is not consistent with a shot having come from Dillard Ave. – Longwood Ave.

{¶24} Detective Gibbs collected several items from the crime scene, including spent shell casings from both ends of Longwood Ave. Gibbs testified that the majority of the shell casings were located in front of 3805 and 3809 Longwood Ave., the location from which Morgan testified the shooter with the red jacket was shooting around the van.

Detective James Raynard, a technician with the crime scene unit, collected additional evidence from the scene. He testified that the majority of the suspected copper jackets and lead-bullet fragments were discovered near Longwood Ave. and Dillard Ave., the area toward which witnesses say the shooters were aiming and where Danica Nelson was found shot.[2]

{¶25} Detective James Kooser, an expert in firearms examination, testified that he examined bullets, bullet fragments, and 30 spent cartridge cases that were collected from the crime scene. He also examined state's exhibit No. 232, the gun that the shooter with the red jacket threw at Morgan ("the Kimmie weapon"). He identified the gun as a Star .9mm, and he found it to be operable.

{¶26} Upon examining the 30 spent cartridge cases, Kooser determined that there were four firearms involved in the incident of August 27th, all of which were .9mm pistols. Of these cartridge cases, Kooser testified that 5 were from an unknown firearm, four were from a second unknown .9mm firearm, 15 were from a third unknown firearm, and 6 were fired from the Star .9mm pistol (state's exhibit No. 232) that the shooter in the red jacket threw at Morgan. Kooser testified, however, that he was not able to determine which weapon fired the shot that killed Nelson.

{¶27} Kooser examined the bullet fragment that came from the morgue where the medical examiner performed the autopsy of Danica Nelson. According to Kooser, this

---

[2]Detective James Kooser explained to the jury that a copper jacket, like those discovered at the crime, covers the lead of a bullet and will often break into fragments when the bullet hits its target.

fragment, known as the morgue pellet, "is of no analytical value" because it is "[j]ust a teeny tiny fragment." He acknowledged, however, that it is possible that the fragment was fired from one of the four guns to which the 30 cartridge cases were attributed.

Additional Witness Testimony

{¶28} K.J.'s sister, Demetria Linder, testified that she was sitting on the curb with Nelson, Moore, and others when she first heard shots coming from E. 38th St. and Longwood Ave. She stated that shots were being fired back toward E. 38th St. from the corner where Linder and her friends had been standing. Linder testified that she knew there was more than one shooter from the different sounds the guns were making. She identified Kimmie's codefendant, Jontez Robinson, as a shooter. She stated that Robinson was with a group of boys who were not from the Longwood Ave. neighborhood. Prior to the shooting, she had witnessed two arguments. One of the arguments involved an older man she recognized from the Longwood Ave. neighborhood who was arguing with people she did not recognize. This group was on the southeast corner of Longwood Ave. and Bivens. She had also witnessed two girls fighting over a boy earlier in the evening.

{¶29} Lizaria Moore was at the party with K.J. and Nelson. She also testified that there was a fight during the party between two girls. After Moore and her friends left the party, they walked toward E. 39th St. and sat on the curb. She testified that she saw a group of boys she did not know, one of whom was wearing black, and one who was wearing a red and black hoodie. Some of the gunshots she heard came from the area

where she saw the group of unknown boys.  Moore identified state's exhibits Nos. 193 and 194 as the jacket one of the boys in that group was wearing.

{¶30} James Willingham was with Linder and the others after the party in the area of E. 39th St. – Longwood Ave. and Dillard Ave. – Longwood Ave.  He testified that he was standing in front of 3914 Longwood Ave., facing the houses, when shots were fired from behind his right shoulder.  After he heard the first shot from behind him, he then heard multiple shots firing.  He pushed Linder to the ground and hid by the white car where K.J. was hiding.  While hiding, he realized he had been shot in the foot.  Once the shooting stopped, he hopped up and ran "around the corner" onto Dillard Ave. While running, he saw Nelson on the ground and realized that she had been shot.

{¶31} Raynell Williams, a resident of Longwood Ave., testified that he was home the night of the back-to-school party and was looking out his window after the party broke up.  He heard arguing east of E. 39th St. on Longwood Ave. and he saw Kimmie standing outside with other people, "talking to his friends."  Williams testified that he heard gunfire, "[m]ore than 10 maybe," though he gave conflicting accounts as to the direction from which the gunfire came.  Williams stated that he saw Kimmie before he heard the gunfire.  He testified that upon hearing gunfire, he and his family got down on the floor and took cover.

{¶32} Prior to the trial, Williams gave a statement to the police and made a pretrial photo identification of Kimmie as the shooter, writing on the photo, "shooting, dropping the gun."  His statement included a description of how Kimmie was shooting and a

demonstration of how Kimmie fell. Williams also identified codefendant Robinson in a photo lineup. On the stand, however, Williams surprised the court when he stated that his statement was not his own; rather, he "was told this whole story," and based on rumors, he "put the pieces together." After this statement, Williams admitted that he had previously expressed concern about testifying in open court.

### Kimmie's Statement

{¶33} Officer Ryan McMahon, a Cleveland police officer in the fourth district, assisted in Kimmie's arrest on September 14, 2011, after a warrant was issued for his arrest. McMahon testified that after calling Kimmie's mother, he searched the home and discovered Kimmie hiding under a blanket in the basement. McMahon arrested Kimmie and took him to the homicide unit.

{¶34} Following Kimmie's arrest, Detectives Griffin and Ansari interviewed Kimmie. In the course of the interview, Kimmie made a statement concerning the shooting. Detective Griffin read Kimmie's statement to the jury. In his written statement, Kimmie states, "the Valley Boys got to busting us, so we started shooting at them." He also states, "I was shooting. I turned around and TD Security was standing there. I ran from them. I threw the gun on the ground. * * * I had on a red jacket. I took my jacket off and threw it on the ground near the parking lot."

{¶35} Kimmie later states, however, that he will "tell the truth now." Thereafter, Kimmie states, "After they started shooting, I went to the ground and shot four times in the air. I did not aim toward where the shots were coming from. I just shot in the air."

Kimmie also denies shooting Nelson in his statement, saying, "Shawn told me that as they drove by the girl on the ground Shawn said, 'that's what that ho' get." Kimmie provides in his statement that no one from the police department induced him into making the statement.

## Assignments of Error

I.   The trial court erred by denying appellant's motion to suppress in violation of appellant's constitutional rights.

II.   The trial court erred by denying appellant's request for jury instructions on negligent assault, involuntary manslaughter, and self-defense.

III.   Appellant's constitutional rights were violated when the trial court denied his request to admit the transcript of his police interview into evidence where the state had introduced only a portion of it through an officer's testimony about appellant's written statement.

IV.   Appellant was denied a fair trial when the trial court allowed inadmissible evidence to be introduced at trial.

V.   The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions for felonious assault and murder.

VI.   Appellant's convictions for felonious assault and murder are against the manifest weight of the evidence.

VII.   The trial court erred by imposing consecutive sentences.

## I. Motion to Suppress

{¶36} Detectives Griffin and Ansari interviewed Kimmie after his arrest. Griffin testified that prior to interviewing Kimmie, he phoned Kimmie's mother and informed her that the detectives had her son and they were not going to speak to him until his parents arrived, "out of due respect to them." Griffin testified that he verbally advised Kimmie of his *Miranda* rights, and he produced a written advisement of his rights as well. With both his mother and father present, Kimmie made a three-page written statement to the police. The entire interview was videotaped and a transcript was made of the interview.

{¶37} Prior to trial, Kimmie filed a motion to suppress his post-arrest statement to police, claiming that his statement was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Kimmie also argued that his statement was involuntary because he was not advised of his rights under *Doyle v. Ohio*, 426 U.S. 610, 611, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The trial court denied the motion, finding that Kimmie received adequate warning of his *Miranda* rights, and he voluntarily waived those rights.

{¶38} In his first assignment of error, Kimmie contends that the trial court erred when it denied his motion to suppress his statement to the police.

{¶39} Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. In considering a motion to suppress, the trial court assumes the role of trier of fact and, therefore, is in the best position to resolve factual questions and evaluate the credibility of

witnesses. *Id*., citing *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). Consequently, a reviewing court must accept the trial court's findings of fact as long as they are supported by competent, credible evidence. *State v. Preztak*, 181 Ohio App.3d 106, 2009-Ohio-621, 907 N.E.2d 1254, ¶ 22 (8th Dist.), citing *State v. Lloyd*, 126 Ohio App.3d 95, 709 N.E.2d 913 (7th Dist.1998). Once we accept those facts as true, however, we must independently determine, "as a matter of law and without deference to the trial court's conclusion, whether the trial court met the applicable legal standard." *Id.*

<u>The *Miranda* Rights</u>

{¶40} In *Miranda*, the United States Supreme Court held that a defendant who is subjected to custodial interrogation must be advised of his or her constitutional rights and make a knowing and intelligent waiver of those rights before statements obtained during the interrogation will be admissible. 384 U.S. at 478-479, 86 S.Ct. 1602, 16 L.Ed.2d 694.

> A suspect in police custody 'must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'"

*State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, 853 N.E.2d 279, ¶ 6, quoting *Miranda* at 479.

{¶41} Juveniles are afforded the same protection outlined in *Miranda*.

> """Juveniles are entitled both to protection against compulsory self-incrimination under the Fifth Amendment and to *Miranda* warnings where applicable.'" [*In re K.W.*, 3d Dist. Marion No. 9-08-57, 2009-Ohio-3152, ¶ 12, quoting *State v. Thompson*, 7th Dist. Jefferson Nos.

98 JE 28, 98 JE 29, 2001-Ohio-3528, citing *In re Gault*, 387 U.S. 1, 54, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).] Any statements made by a suspect may not be used in evidence where those statements were made during a custodial interrogation unless *Miranda* warnings were properly given to the suspect. *State v. Andrews*, 3d Dist. No. 1-05-70,2006-Ohio-3764, ¶ 18, citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *State v. Mason*, 82 Ohio St.3d 144, 153, 1998-Ohio-370, 694 N.E.2d 932."

*In re M.W.*, 8th Dist. Cuyahoga No. 94737, 2010-Ohio-6362, ¶ 20, quoting *In re Forbess*, 3d Dist. Auglaize No. 2-09-20, 2010-Ohio-2826, ¶ 27.

{¶42} In this case, Detectives Jamal Ansari and Lem Griffin conducted Kimmie's interview at the police station. According to the transcript of the interview and Detective Ansari's testimony at the suppression hearing, the detectives did not begin the interview until Kimmie's parents, Marcus Kimmie and Lakisha Bennett, had been contacted and had arrived. The detectives allowed Kimmie to speak with his parents before the interview began. In the presence of his mother and father, Detective Griffin explained the charges against Kimmie and advised Kimmie not to speak at that time, but rather, he said, "I just want you to listen to me." Thereafter, Griffin told Kimmie that "before you say anything, I got to read you your rights. Before you talk to me * * *, I got to give you your rights." Griffin then ensured that Kimmie could read and gave him a placard that outlined the *Miranda* rights. Kimmie read the placard aloud, and Griffin ensured, once again, that Kimmie understood what he had just read.

{¶43} After Kimmie read the *Miranda* placard, Griffin asked Kimmie if he wanted to talk with him, "tell [his] side of the story." Kimmie responded, "Yeah." The detectives proceeded to explain and review the advice of rights and waiver form with

Kimmie and his parents. Kimmie and his parents signed the form. At the suppression hearing, Kimmie's mother testified that her son was not confused by the *Miranda* rights as they were explained to him.

{¶44} Additionally, prior to obtaining Kimmie's written statement, the detectives presented him with a document that stated:

> Before making any written statement that may be used against you at the time of your trial, we wish to repeat these instructions prior to our oral interrogation:

> That you have the right to counsel appointed or retained, before interrogation, that you have the right to remain silent, and that anything you say may be used against you.

> You have the right to have an attorney present while making this statement.

Below these words, Kimmie signed his name, acknowledged that he understood the rights as stated above, and indicated that he wanted to make a statement.

{¶45} We, therefore, find that the evidence presented at the suppression hearing demonstrates that Kimmie was properly advised of his *Miranda* rights and that he acknowledged his understanding of these rights both verbally and in writing.

### Voluntary Waiver

{¶46} Kimmie also contends that he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights in making his statement to Detectives Ansari and Griffin.

{¶47} A criminal suspect may waive his or her *Miranda* rights; however, the waiver must be made voluntarily, knowingly, and intelligently. *State v. Kent*, 8th Dist.

Cuyahoga No. 90795, 2009-Ohio-3889, ¶ 26, citing *Miranda* at 444. In order to determine whether a defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights, a reviewing court must examine the totality of the circumstances of the waiver. *State v. Gumm*, 73 Ohio St.3d 413, 429, 1995-Ohio-24, 653 N.E.2d 253. The totality of the circumstances includes "the age, mentality and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 57, quoting *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus. This same review applies to juveniles in a custodial interrogation. *In re M.W.*, 8th Dist. Cuyahoga No. 94737, 2010-Ohio-6362, at ¶ 21.

{¶48} Under the totality of the circumstances, we cannot say that Kimmie's waiver of his *Miranda* rights was involuntarily or unknowingly made. Kimmie was 17 years old at the time of his arrest. There is nothing in the record, however, to suggest that his age impaired his ability to understand or appreciate his rights as advised by the detectives upon his arrest. There is also nothing in the record to suggest that Kimmie's mental capacity is diminished or impaired in any way. The detectives reviewed with Kimmie and his parents the advice of rights and waiver form before all three signed the form. In response to the detective's repeated questions as to whether Kimmie understood the *Miranda* placard, what Kimmie read aloud, and what the detectives told him before beginning the interrogation, Kimmie responded, "Yeah." His mother testified that

Kimmie was not confused by the *Miranda* rights as they were explained to him. Furthermore, Kimmie's parents were present during the entire interrogation, and Kimmie was permitted to consult with his parents outside the presence of the detectives.[3]

{¶49} Kimmie contends that he was intimidated by his father during the interrogation and, thus, his statement was coerced. We cannot find, however, that Kimmie's statements to the detectives were coerced or involuntary in this regard. First, there is no evidence of threats, inducement, or coercion by Detectives Ansari and Griffin. While not obligated to do so, the detectives waited for Kimmie's parents to arrive. They removed Kimmie's handcuffs; they allowed Kimmie to wear his father's coat as it appeared cold in the interrogation room; and they allowed Kimmie to speak with his parents outside the presence of the detectives. Finally, the detectives repeatedly explained Kimmie's rights to remain silent and to consult with an attorney before answering any questions during the initial phase of the interview.

{¶50} Second, there is no evidence that the detectives used Kimmie's parents to pressure Kimmie into making a statement or that Kimmie was, in fact, intimidated by his father's presence. While Kimmie's grandmother, Ms. Brown, testified that Kimmie

---

[3]Kimmie's grandmother, Mae L. Brown, testified that Kimmie's parents had a "learning disability" during school, and Ms. Bennett admitted she "can't read that much" and "doesn't understand a lot of things." There is no evidence to suggest, however, that this learning disability impaired their ability to support Kimmie or to understand or appreciate Kimmie's arrest. There is also no evidence that the mental capacities of Kimmie's parents interfered with Kimmie's own ability to understand and appreciate his rights as explained to him during the interrogation.

was "intimidated by the situation" and "intimidated with his father being there," the evidence does not support this statement.

**{¶51}** On the contrary, Kimmie's father displayed affection and support for his son throughout the interview, hugging Kimmie upon arrival at the police station. While the transcript of the interview demonstrates Mr. Kimmie used some harsh language in expressing his feelings toward his son's situation, the trial court indicated that it observed no evidence of intimidation by Mr. Kimmie. Rather, Mr. Kimmie told his son that he's "got [his] back." He also said, "We'll be here for you * * * until the end of time. * * * All I can do is hold your hand and show you I'll be with you and fight * * *." Mr. Kimmie also expressed disappointment as a parent in Kimmie not coming to his father for help, saying, "[Y]ou should have came and talked to me first. I wouldn't have turned you in or nothing like that. You're my son and I love you." Mr. Kimmie promised his son that he would get a lawyer to defend him. These statements, as the trial court observed, indicate that Mr. Kimmie was encouraging his son to cooperate with the police while promising to help his son. Mr. Kimmie's statements are not indicative of threats or intimidation.

**{¶52}** Kimmie also claims that his parents' statements concerning obtaining a lawyer confused him and, therefore, rendered his statement to the detectives involuntary. The evidence, however, does not support Kimmie's assertion.

**{¶53}** After Kimmie reads the *Miranda* placard aloud, Mr. Kimmie, said to his son:

I'm going to tell you like this, I ain't going to sugar coat nothing. You're going to do some time. Regardless of the fact, you're going to do some time because somebody got killed and you was implicated in it. How much time you do is on you. I don't want you to do no time, but I can't save you. But I can't save you from this one. All I can do is hold your hand and show you I'll be with you and fight * * *.

Now, me myself, I want you to sit here and tell them what happened. I really do. But then I also want you to consult with a lawyer.

Kimmie's mother, Lakisha Bennett, interjected, "You're going to get a lawyer," which was confirmed by Mr. Kimmie, saying, "Regardless. There's no ifs, ands, and buts about it. We're going to get you a lawyer." Immediately following this exchange, Kimmie told Detective Griffin that he wished to tell his side of the story. Kimmie did not express confusion, ask for clarification, or otherwise question his parents or the detectives concerning the rights that were just explained to him.

{¶54} Additionally, prior to signing the advice of rights and waiver form and prior to Kimmie making a statement, Mr. Kimmie said to his son, "T, I want you to do this. Like I said, it's your right, it's your decision. Everything you're saying now you're doing it without the consult of a lawyer. That's what you want to do, right? Hum? You're 17." Again, Kimmie did not express confusion or indicate that he did not understand his rights. Further, at no time during the 3½ hour interview process did Kimmie or his parents inform the detectives that they wished to stop the interrogation and obtain a lawyer. The above statements made by Kimmie's parents indicate, rather, their desire to obtain an attorney on their son's behalf in the future.

**{¶55}** At best, Kimmie's parents' expressed desire to obtain counsel on their son's behalf was ambiguous. Such ambiguity is not an effective assertion of the right to counsel that requires the cessation of questioning in a custodial interrogation. The United States Supreme Court has held that when a defendant invokes his right to counsel, police must cease interrogation until his counsel is present. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Police officers, however, are not required to stop questioning a suspect immediately upon the making of an "ambiguous or equivocal reference to an attorney." *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L.Ed.2d 362 (1994). Rather, the suspect must unambiguously request counsel.

> He must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect.

*Id.* In this case, Mr. Kimmie's and Ms. Bennett's statements concerning obtaining counsel for their son were equivocal and do not rise to the level of a request for counsel that would require Detectives Ansari and Griffin to stop Kimmie's interrogation.

**{¶56}** During the suppression hearing, Ms. Brown, Kimmie's paternal grandmother, testified that upon learning of Kimmie's arrest, she called the police and asked that Kimmie not be interviewed without her and that she told them she had contacted a lawyer. She stated that the lawyer advised her that her grandson should not

speak with anyone. She could not, however, recall the name of the lawyer, nor was there any evidence that she hired a lawyer.

**{¶57}** Ms. Brown testified that a detective on the case told her not to come to the police station because they had contacted Kimmie's parents and his parents were on their way to the police station. According to Ms. Brown, she believed she had custody of Kimmie — not Kimmie's parents. There is no independent evidence, however, of Ms. Brown's custody of Kimmie to support Ms. Brown's belief. Furthermore, Kimmie was living with his mother at the time of his arrest.

**{¶58}** Regardless of the custody arrangement, however, the law in Ohio does not require that a juvenile's parent or legal custodian be present during a custodial interrogation. This court has held that "[t]hough the greatest care must be taken to assure a juvenile's admissions are voluntary, parental presence is not constitutionally mandated." *State v. Bates*, 8th Dist. Cuyahoga No. 92323, 2009-Ohio-5819, ¶ 10, quoting *State v. Bobo*, 65 Ohio App.3d 685, 690, 585 N.E.2d 429 (8th Dist.1989); *see also In re Gault*, 387 U.S. at 55, 87 S.Ct. 1428, 18 L.Ed.2d 527. The presence of a parent or custodian during a juvenile's interrogation, therefore, is only one factor to consider in determining whether, under the totality of the circumstances surrounding the juvenile's statements, there is a valid waiver of the juvenile suspect's *Miranda* rights. *Id.*

**{¶59}** In this case, Detectives Ansari and Griffin contacted Kimmie's parents and conducted Kimmie's interview in the presence of his parents. The detectives contacted Ms. Bennett and Mr. Kimmie as a courtesy to Kimmie's parents, not out of legal

obligation to do so. The detectives were not required to wait for Kimmie's legal custodian, whether it was Kimmie's parents or his grandmother. Therefore, in light of the circumstances surrounding Kimmie's statement, Ms. Brown's absence, in and of itself, does not render Kimmie's statements to the detectives involuntary.

{¶60} Ms. Brown also testified that she told the lawyer with whom she spoke on the telephone that Kimmie's parents were going to the police station. Ms. Brown stated that the lawyer told her to have Kimmie's parents call him. According to Ms. Brown, Mr. Kimmie was aware of her conversation with the lawyer; nonetheless, Mr. Kimmie did not share this information with the detectives, nor did he at any time during the interview stop the interrogation and advise the detectives that his son would not speak to the detectives without a lawyer. Additionally, Ms. Bennett testified that Ms. Brown told her not to let "T-Y" talk. Ms. Bennett, however, stated that she did not inform the police about her conversation with Ms. Brown and she did not advise police that she wanted a lawyer for her son. Ms. Bennett admitted that she signed the advice of rights and waiver forms, though she did not know why and that she was "scared and confused."

{¶61} In considering the totality of the circumstances outlined above, we find the evidence demonstrates that Kimmie was repeatedly advised of his rights during the interview and he understood those rights as they were explained to him. Kimmie did not at any time express confusion with respect to his rights or request a lawyer and stop the interrogation. There is also no evidence that Kimmie's statement to the detectives was

coerced — either by threat or intimidation.   Therefore, we find that Kimmie voluntarily, knowingly, and intelligently waived his *Miranda* rights.

The <u>*Doyle* Right</u>

{¶62} Lastly, Kimmie argues that his statement should have been suppressed because he could not have adequately understood the full scope of his Fifth Amendment rights before he began speaking to the detectives, based upon the fact that he was not advised of his *Doyle* right to protected silence.   Kimmie essentially argues that the *Miranda* warnings, including the right to remain silent, should be expanded to include the rights outlined in *Doyle*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91, specifically that a defendant's silence cannot be used against the defendant at trial.   We decline to do so here.

{¶63} In *Doyle*, the Supreme Court of the United States held that using a defendant's silence at the time of arrest and after the administration of *Miranda* rights, for purposes of impeachment at trial, violates the Due Process Clause of the Fourteenth Amendment.   In so holding, the Supreme Court determined that once a criminal defendant receives the *Miranda* warnings, the state may not impeach the defendant by causing the jury to draw an impermissible inference of guilt from the defendant's post-arrest silence.   *Id.*   "*Doyle* rests on 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.'"   *Wainwright v. Greenfield*, 474

U.S. 284, 291, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986), quoting *South Dakota v. Neville*, 459 U.S. 553, 565, 103 S. Ct. 916, 74 L.Ed.2d 748 (1983).

**{¶64}** As we previously stated, *Miranda* requires that a suspect in custody be advised prior to any questioning that he has the right to remain silent, anything he says can be used against him in a court of law, he has the right to the presence of an attorney, and if he cannot afford an attorney one will be appointed for him. *Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, 853 N.E.2d 279, at ¶ 6, quoting *Miranda* at 479. *Miranda* does not require, however, any additional warnings beyond what has been stated. *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 69. *See also United States v. Ricks*, 6th Cir. No. 92-5503, 1993 U.S. App. LEXIS 6517 (March 19, 1993) (suspect need not be informed that he has the right to stop answering questions at any time); *United States v. Lares-Valdez*, 939 F.2d 688 (9th Cir.1991) (suspect need not be advised of the right to have questioning stopped at any time, of the option to answer some questions but not others, or that some questions may call for incriminating responses); *United States v. Caldwell*, 954 F.2d 496, 501-504 (8th Cir.1992) (suspect need not be explicitly advised of his right to counsel before and during questioning); *United States v. DiGiacomo*, 579 F.2d 1211, 1214 (10th Cir.1978) (no express requirement under *Miranda* to advise suspects of the right to terminate questioning).

**{¶65}** In this case, Detectives Ansari and Griffin did not begin questioning Kimmie until both his parents arrived, despite no legal obligation to do so. The detectives fully and properly advised Kimmie of his rights as required by *Miranda*. They

allowed Kimmie to speak with his parents alone. They began the interrogation after Kimmie was advised of his *Miranda* rights, and they ensured that he understood those rights. At no time did Kimmie — or his parents — ask for a further explanation of his rights or that the interview be stopped. The detectives were not required to anticipate a misunderstanding of his rights, repeatedly advise Kimmie of his right to ask for a lawyer, or stop the interrogation at any time after the interview had begun. "[T]here are numerous circumstances and ways in which the right to silence may be invoked and officers could not possibly warn of all of them. Having advised of the essential rights, the officers are not obliged to warn of any or all of the circumstances or manners in which the right may be invoked." *Foust* at ¶ 71, quoting *United States v. Alba*, 732 F.Supp. 306, 310 (D.Conn.1990). We, therefore, find that Kimmie was given adequate warning of his *Miranda* rights, and no further warning was required.

**{¶66}** Based upon the foregoing, we find the trial court had competent, credible evidence to refute Kimmie's claims that his post-arrest statement to the police was in violation of his *Miranda* rights. As such, the trial court did not err in denying Kimmie's motion to suppress.

**{¶67}** Kimmie's first assignment of error is overruled.

## II. Jury Instructions

**{¶68}** With respect to Kimmie's second assignment of error, the trial court instructed the jury as follows: (1) Count 1 — aggravated murder and the lesser included offenses of murder and reckless homicide; (2) Count 2 — murder and the lesser included

offense of reckless homicide; and (3) Counts 3 and 4 — felonious assault. Kimmie contends that the trial court erred in denying his request for jury instructions on involuntary manslaughter and negligent assault as lesser offenses to murder and felonious assault, respectively, in Counts 2, 3, and 4, and in refusing to instruct on self-defense. Kimmie argues that the evidence warranted such instructions. We disagree.

{¶69} We review a trial court's issuance of jury instructions for an abuse of discretion. *State v. Williams*, 8th Dist. Cuyahoga No. 90845, 2009-Ohio-2026, ¶ 50. To constitute an abuse of discretion, the ruling must be unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983). Further, jury instructions are reviewed in their entirety to determine if they contain prejudicial error. *State v. Fields*, 13 Ohio App.3d 433, 436, 469 N.E.2d 939 (8th Dist.1984).

### Negligent Assault and Involuntary Manslaughter

{¶70} Kimmie requested jury instructions on negligent assault in Counts 3 and 4 and involuntary manslaughter in Count 2. Kimmie claims that the instructions should have been included because they are lesser included offenses and because the evidence warrants such inclusion.

{¶71} In order to determine whether an instruction on a lesser included offense is warranted, the trial court must conduct a two-part test. First, the trial court must determine if the requested charge is a lesser included offense of the charged crime. *State v. Kidder*, 32 Ohio St.3d 279, 281, 513 N.E.2d 311 (1987). Second, the trial court must

look at the particular evidence in the case and determine if the evidence adduced at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense. *State v. Benson*, 8th Dist. Cuyahoga No. 87655, 2007-Ohio-830, ¶ 112, citing *State v. Thomas*, 40 Ohio St.3d 213, 216, 533 N.E.2d 286 (1988); *Kidder*. A lesser included offense instruction, therefore, requires more than "some evidence" that a defendant may have acted in such a way as to satisfy the elements of the lesser offense. *State v. Shane*, 63 Ohio St.3d 630, 633, 590 N.E.2d 272 (1992). Moreover, a defendant's own testimony that he did not intend to kill his victim does not alone entitle him to a lesser included offense instruction. *See State v. Campbell*, 69 Ohio St.3d 38, 48, 630 N.E.2d 339 (1994) (denying jury instructions on involuntary manslaughter where evidence showed a purposeful killing); *Shane* at 633 (rejecting jury instructions on involuntary manslaughter because "some evidence" of involuntary manslaughter was insufficient). Thus, an involuntary manslaughter instruction is justified "only when, on the evidence presented, the jury could reasonably find against the state on the element of purposefulness and still find for the state on the defendant's act of killing another." *Thomas* at 216.

{¶72} In this case, the trial court instructed the jury in Counts 3 and 4 on felonious assault in violation of R.C. 2903.11(A)(2), which provides that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." A person acts knowingly, "regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will

probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). Kimmie requested additional instructions on negligent assault. Ohio's negligent assault provision provides that "[n]o person shall negligently, by means of a deadly weapon or dangerous ordnance * * * cause physical harm to another * * *." R.C. 2903.14(A). "A person acts negligently when, because of a substantial lapse from due care, he fails to perceive or avoid a risk that his conduct may cause a certain result or may be of a certain nature." R.C. 2901.22(D).

{¶73} The trial court also instructed the jury on murder in Count 2 in violation of R.C. 2903.02(B), which provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." Kimmie, however, requested instruction on involuntary manslaughter under R.C. 2903.04(B). Involuntary manslaughter, which is a lesser included offense of murder, is defined as follows: "No person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a misdemeanor of any degree * * *." R.C. 2903.04(B).

{¶74} As outlined above, the difference between the instructions the trial court gave the jury (murder and felonious assault) and those instructions Kimmie requested for the lesser included offenses (involuntary manslaughter and negligent assault) is the culpable mental state — the difference between acting knowingly and acting negligently.

**{¶75}** The state concedes, in this case, that negligent assault is a lesser included offense of felonious assault and involuntary manslaughter is a lesser included offense of murder. The state contends, however, that the trial court did not err in refusing to instruct on negligent assault and involuntary manslaughter based upon the evidence adduced at trial. The question, therefore, is whether the evidence would reasonably support both an acquittal on the crimes charged and a conviction upon the lesser included offenses. *Benson*, 8th Dist. Cuyahoga No. 87655, 2007-Ohio-830, at ¶ 112.

**{¶76}** In support of his request for instruction on the lesser included offenses, Kimmie claims that he shot his weapon four times into the air. This statement, however, is only "some evidence" going to the lesser included offenses. It is not enough evidence to warrant the jury charge on those lesser included offenses. *Campbell*, 69 Ohio St.3d at 47, 630 N.E.2d 339; *Shane*, 63 Ohio St.3d at 632-633, 590 N.E.2d 272.

**{¶77}** Several witnesses testified that they heard shots coming from E. 38th St. and Longwood Ave. toward the area of Dillard Ave., where the victims — Nelson, K.J., and Willingham — had been standing. Officer Tate testified the person shooting from behind the van, in that area of E. 38th St. and Longwood Ave., was "blindly firing into a crowd." Morgan testified that he saw two to three shooters reaching over a black van shooting into the crowd, toward the victims. Cumulatively, as the trial court found, the evidence as presented above does not demonstrate "mere negligence" in discharging a weapon, stating that "there is no evidence that this was any kind of accidental shooting." The court further found that "the discharge of a firearm over a public road or highway as

a misdemeanor offense that would end up causing the loss of life" is not supported by the facts and evidence of this case in order to support the charge of involuntary manslaughter. Rather, the evidence supports a knowing act as provided in the jury instructions on murder and felonious assault.

{¶78} Moreover, this court has previously held that evidence that a defendant shot a gun into a crowd of people was sufficient to establish the purposefulness element of R.C. 2903.02(A). *State v. Williamson*, 8th Dist. Cuyahoga No. 95732, 2011-Ohio-4095, at ¶ 19.

{¶79} In light of the above, we cannot find that the trial court abused its discretion in refusing to instruct the jury on negligent assault and involuntary manslaughter. As the trial court determined, the evidence on the whole does not reasonably support an acquittal on the charged crimes of murder and felonious assault and a conviction upon the lesser included offenses.

Self-Defense

{¶80} Kimmie also claims that the trial court erred in denying his request to include the jury instruction for self-defense. We disagree.

{¶81} In order to establish self-defense, Kimmie must demonstrate by a preponderance of the evidence that (1) he was not at fault in creating the situation giving rise to the affray; (2) he had a bona fide belief that he was in imminent danger of great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) he must not have violated any duty to retreat or avoid danger. *State v.*

*Williford*, 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990); *see also State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus. The elements of self-defense are cumulative and "'[i]f the defendant fails to prove any one of these elements by a preponderance of the evidence, he has failed to demonstrate that he acted in self-defense.'" *Williford*, quoting *State v. Jackson*, 22 Ohio St.3d 281, 284, 490 N.E.2d 893 (1986).

{¶82} In this case, the trial court concluded that an instruction on self-defense was not warranted because the evidence did not support a claim of self-defense. The trial court found that the only evidence of self-defense in this case was testimony that someone other than Kimmie fired the first shot.

{¶83} The overwhelming evidence, however, demonstrated that there was a shoot-out between two groups, located at opposing ends of Longwood Ave. In his statement to police, Kimmie stated that "the Valley Boys got to busting us, so we started shooting at them." There was constant firing and more than 30 spent shell casings discovered at the crime scene. Furthermore, there is no evidence that Kimmie was in fear for his life and not at fault in creating the affray, that his only means of escape from such danger was in the use of such force, or that he attempted to withdraw from the conflict. *Robbins* at 80-81. As such, the evidence adduced at trial could not reasonably support a jury conclusion that Kimmie acted in self defense when he engaged in a gun fight.

{¶84} Additionally, Kimmie cannot claim that his actions were both negligent and in self-defense. Kimmie's self-defense argument negates his claim that the jury should have been instructed on the lesser included offense of negligent assault. *State v. Mobley-Melbar,* 8th Dist. Cuyahoga No. 92314, 2010-Ohio-3177, ¶ 28, citing *State v. Coleman*, 8th Dist. Cuyahoga No. 80595, 2002-Ohio-4421, ¶ 25. "[B]ecause the claim of self-defense is inconsistent with an unintentional shooting, an instruction on negligent assault where the defendant claims self-defense would be unwarranted." *Coleman*, citing *State v. Parra*, 61 Ohio St.2d 236, 400 N.E.2d 885 (1980).

{¶85} Given the above, we cannot find that the trial court abused its discretion in denying Kimmie's proposed jury instructions on self-defense.

{¶86} We, therefore, find that the trial court properly denied instructing the jury on negligent assault, involuntary manslaughter, and self-defense. Accordingly, Kimmie's second assignment of error is overruled.

### III.  Videotaped Interview

**{¶87}** Kimmie's entire police interview was recorded, and a transcript of the interview was prepared.  During the interview, Kimmie made a written statement after waiving his *Miranda* rights.  At trial, the state introduced only a portion of the interview — Kimmie's written statement — through the testimony of Detective Griffin, who conducted the police interview along with Detective Ansari.  In Kimmie's third assignment of error, Kimmie argues that his constitutional rights were violated when the trial court denied his request to admit the entire transcript of his videotaped police interview where the state had introduced only a portion of the interview through the detective's testimony.  Kimmie contends that the videotape is admissible and should have been considered at trial.  For the following reasons, we find no merit to Kimmie's argument.

**{¶88}** Kimmie claims that, pursuant to Evid.R. 106, either the videotape or the transcript should have been admitted.  Because the entire interview was not admitted, Kimmie argues that he was deprived of a fair trial.

**{¶89}** Evid.R. 106 is known as the "rule of completeness."  *Perry v. Univ. Hosps.*, 8th Dist. Cuyahoga No. 83034, 2004-Ohio-4098, ¶ 57.  This rule states that if one party moves to introduce parts of a document, the opposing party can request that the entire document be immediately submitted:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which is otherwise

admissible and which ought in fairness to be considered contemporaneously with it.

Evid.R. 106.

**{¶90}** The overriding purpose of the rule is to prevent adverse parties from taking statements or writings out of context and distorting them. *Perry*. The Staff Note to Evid.R. 106 warns that the rule applies to writings and recordings and parts of the recording that are "otherwise admissible"; it does not apply to conversations. Evid.R. 106; *State v. Lewis*, 7th Dist. Mahoning No. 03 MA 36, 2005-Ohio-2699, ¶ 126.

**{¶91}** In *Lewis, supra*, a factually similar case, the appellant argued that his entire videotaped confession should have been played for the jury so that they could hear parts of the tape where he made certain exculpatory statements. As in this case, the state in *Lewis* did not introduce the videotaped statement, however; it questioned the detective who interviewed the appellant about what appellant told him. In denying the admission of appellant's entire videotaped confession, the Seventh District Court of Appeals determined that the state could ask the detective to testify as to what appellant told him under Evid.R. 801(D)(2)(a), which provides that a statement is not hearsay if it is offered against a party and is his own statement: "This rule explicitly demonstrates that appellant's statement is admissible non-hearsay only if it is offered by the state." *Lewis* at ¶ 127.

**{¶92}** The court, therefore, found that appellant could not use this rule to offer his own out-of-court statement. *Id.*, citing *In re Coy*, 67 Ohio St.3d 215, 218, 1993-Ohio-202, 616 N.E.2d 1105; *State v. Wilson*, 12th Dist. Clermont No.

CA2001-09-072, 2002-Ohio-4709, ¶ 57 (defendant cannot offer exculpatory hearsay statement); *State v. Gatewood*, 15 Ohio App.3d 14, 16, 472 N.E.2d 63 (1st Dist.1984) (holding that the defendant is not entitled to introduce taped interview with police). Thus, if the defendant does not take the stand, he cannot introduce his own statements made in a videotaped statement unless he can point to a hearsay exception. *Lewis* at ¶ 128; *State v. Vidu*, 8th Dist. Cuyahoga Nos. 71703 and 71704, 1998 Ohio App. LEXIS 3390 (July 23, 1998).[4]

{¶93} Kimmie argues one such exception — that the videotape was the best evidence under Evid.R. 1002 and, therefore, admissible. Evid.R. 1002 requires an original document or recording "[t]o prove the content of a writing, recording, or photograph, * * * except as otherwise provided in these rules * * *." The Staff Notes to Evid.R. 1002 provide that the original of a writing or photograph or recording is required as the "best evidence" if the particular writing or photograph or recording is introduced to prove its "content." "Thus, if a confession is recorded on tape, the original tape recording would be introducible as the best evidence for its 'content.'" *Id.*

{¶94} The "best evidence" rule, however, does not apply where an officer testifies as to what he heard first-hand. *Lewis*, 7th Dist. Mahoning No. 03 MA 36, 2005-Ohio-2699, at ¶ 132; *State v. Cechura*, 7th Dist. Columbiana No. 99CO74, 2001-Ohio-3250, *19. "[W]hen a person testifies from memory about a conversation

---

[4]While the videotape is admissible if offered by the state, there is no obligation by the state to play it. *Lewis* at ¶ 129, citing *State v. Scales*, 2d Dist. Champaign No. 2002CA27, 2004-Ohio-175, ¶ 9. Rather, the state can ask the interviewing officer to testify about the appellant's statements. *Id.*

they had with a defendant that just so happened to be recorded, they are not attempting to prove the contents of a recording." *Cechura*; *see also State v. Turvey*, 84 Ohio App.3d 724, 735, 618 N.E.2d 214 (4th Dist.1992). This is true where an officer testifies about a confession and the state presents the written confession itself, because neither the testimony nor the written confession is dependent upon the existence of the videotaped confession. *Id.* Therefore, the "best evidence" rule would not apply.

{¶95} In light of the above, we find that Kimmie was not denied a fair trial when the trial court denied his request to admit his entire videotaped interview. Evid.R. 106 is limited to those parts of Kimmie's statements that are otherwise admissible. Detective Griffin testified as to what Kimmie said during his confession, and the state provided Kimmie's written statement that was obtained during the videotaped interview. When offered by the state, this testimony is admissible as a party admission under Evid.R. 801(D)(2)(a). Kimmie's statement is admissible non-hearsay only if offered by the state. Kimmie cannot, however, use Evid.R. 106 to offer his own out-of-court statement. Moreover, the video is not the "best evidence" that is admissible under Evid.R. 1002 because Detective Griffin testified about Kimmie's confession and the state presented the written confession itself. Neither the detective's testimony nor the written confession was dependent upon the existence of the videotaped confession. As such, Kimmie's videotaped statements to Detectives Griffin and Ansari that were not offered by the state are inadmissible hearsay.

{¶96} Accordingly, Kimmie's third assignment of error is overruled.

## IV.  Inadmissible Evidence

{¶97} In his fourth assignment of error, Kimmie claims that he was denied a fair trial when the trial court allowed, over Kimmie's objection, the admission of the following evidence at trial: (1) testimony regarding the use of one of the discovered weapons being used in an unrelated crime; (2) Raynell Williams's pretrial identifications and testimony;[5] and (3) K.J.'s pretrial identification.  Kimmie contends that the above evidence was either hearsay, in violation of Evid.R. 801(C), or not relevant, in violation of Evid.R. 402 and 403.  Additionally, Kimmie argues that the admission of K.J.'s pretrial identification violated Crim.R. 16 in that the identification was not disclosed prior to trial.   For the following reasons, we disagree.

### The NIBIN evidence

{¶98} Kimmie claims that testimony regarding the use of one of the recovered weapons being used in an unrelated crime should have been excluded because its probative value was outweighed by unfair prejudice.

{¶99} Under Evid.R. 402, only relevant evidence is admissible.  Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Although relevant, evidence is not

---

[5]Kimmie claims that the trial court erred by admitting the pretrial identifications and statements made by Raynell Williams through state's exhibits Nos. 226, 227, and 228.   Our review of the transcript, however, reveals that all exhibits pertaining to Williams were withdrawn by the state, including those referenced in Kimmie's fourth assignment of error.

admissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 403. Unfair prejudice is "that quality of evidence which might result in an improper basis for a jury decision." *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 24.

{¶100} A trial court has broad discretion in admitting evidence. Absent an abuse of that discretion and a showing of material prejudice, a trial court's ruling on the admissibility of evidence will be upheld. *Fackelman v. Micronix*, 8th Dist. Cuyahoga No. 98320, 2012-Ohio-5513, ¶ 17. *State v. Martin*, 19 Ohio St.3d 122, 129, 483 N.E.2d 1157 (1985). Because fairness is subjective, the determination as to whether evidence is "unfairly prejudicial" is left to the sound discretion of the trial court, and the decision will be overturned only if that discretion is abused. *State v. Robb*, 88 Ohio St.3d 59, 68, 2000-Ohio-275, 723 N.E.2d 1019.

{¶101} Detective Kooser testified that the third unknown weapon that fired the 15 shots was also used in another crime. According to Kooser, there was a match between one of those 15 shots to a cartridge case found in the national database known as the National Integrated Ballistics Information Network ("NIBIN"), which records crime scene cartridge cases. On cross-examination, Kooser testified that the NIBIN "hit" was not on the weapon connected to Kimmie.

{¶102} The state contends that it elicited the detective's testimony concerning the NIBIN hit for the purpose of establishing that the police continue to look for that particular weapon. The state claims that it did not elicit testimony pertaining to the

particular facts associated with the use of that gun, such as whether the gun matches the group of 15 shell casings or another group. Rather, the defense raised that issue on cross-examination.

{¶103} The trial court overruled Kimmie's objection and allowed the detective's testimony for the state's aforementioned limited purpose. In doing so, the trial court determined that Detective Kooser's testimony in this regard was relevant to the issue of the criminal gang specification. There is no evidence that this limited testimony resulted in an improper basis for the jury's decision or was otherwise unfair or prejudicial. The trial court, therefore, did not abuse its discretion in allowing the relevant testimony.

### Raynell Williams

{¶104} Kimmie also objected to the testimony of Raynell Williams and Williams's pretrial identifications, stating they were based on hearsay. The state contends that parts of Williams's testimony is hearsay; however, the trial court permitted the state to treat Williams as a hostile witness because Williams surprised the court with his testimony on the stand, and this treatment was necessary in order to ask leading questions and impeach his testimony.

{¶105} Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted. Evid.R. 801(C). These statements are generally prohibited unless an exception or exclusion exists to allow such a statement to be used in court. Evid.R. 802.

**{¶106}** A "hostile witness" is one who surprises the calling party at trial by turning against him while testifying. *State v. Darkenwald*, 8th Dist. Cuyahoga No. 83440, 2004-Ohio-2693, ¶ 15-16. The traditional hostile witness is addressed under Evid.R. 607. *Id.* Pursuant to Evid.R. 607, "[t]he credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage * * *."

**{¶107}** Evid.R. 611(C) provides that "[w]hen a party calls a hostile witness, * * * interrogation may be by leading questions" on direct examination. *In re D.C.J.*, 8th Dist. Cuyahoga Nos. 97681 and 97776, 2012-Ohio-4154, ¶ 19. The decision to allow leading questions in the direct examination of a witness is within the trial court's discretion. *State v. Williams*, 8th Dist. Cuyahoga No. 95748, 2011-Ohio-5385, ¶ 20, citing *Ramage v. Cent. Ohio Emergency Serv., Inc.*, 64 Ohio St.3d 97, 1992-Ohio-109, 592 N.E.2d 828, paragraph six of the syllabus.

**{¶108}** In this case, prior to testifying, Williams made a statement to the police in which he related the events of the shooting on Longwood Ave. and identified Kimmie as the shooter, noting on the police photo, "shooting, dropping gun." Williams told the police that Kimmie was shooting at people, not in the air, and he identified the location from where Kimmie was shooting. On the stand, however, Williams told the court, for the first time, that he "was told the whole story," and based on rumors, he "put the pieces

together." Williams told the court that he actually got down on the floor and took cover when he first heard the shots.

{¶109} Upon hearing this new version of events, the prosecutor requested and received permission to treat Williams as a hostile witness. In granting the state's request, the trial court determined that there was surprise and affirmative damage in Williams's testimony on the stand. The prosecutor then proceeded to ask leading questions in order to attack Williams's credibility and impeach his testimony. The record shows that the prosecutor used Williams's written statement solely for purposes of impeachment rather than as an attempt to introduce improper hearsay evidence. We, therefore, find that the trial court did not abuse its discretion in permitting the prosecutor to ask leading questions of Williams and in limiting those questions only to prior inconsistent statements.

<u>K.J.'s Pretrial Identification</u>

{¶110} Kimmie claims that the trial court erred in admitting K.J.'s pretrial identification of Kimmie as the shooter in a photo array because it was not disclosed prior to trial in violation of Crim.R. 16. The state provides that it was unaware of K.J.'s pretrial identification prior to trial.

{¶111} The purpose of Crim.R. 16 is to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large. Crim.R. 16(A). In that regard, the criminal rules mandate that the prosecutor

shall provide * * * the following items related to the particular case indictment, information, or complaint, and which are material to the preparation of a defense, or are intended for use by the prosecuting attorney as evidence at the trial, * * * subject to the provisions of this rule: * * * (5) any evidence favorable to the defendant and material either to guilt or punishment.

Crim.R. 16(B)(5). If a party fails to comply with Crim.R. 16 or an order issued under it, "the court may * * * prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances." Crim.R. 16(L)(1).

{¶112} A trial court has discretion in deciding whether to permit witness testimony. *State v. Wheeler*, 8th Dist. Cuyahoga No. 66923, 1995 Ohio App. LEXIS 2146 (May 28, 1995). Upon review of the trial court's order, an appellate court considers whether there was a willful violation of the discovery rules, if foreknowledge would have benefitted the defendant in preparation of his defense, and whether the accused was unfairly prejudiced. *State v. Wilson*, 8th Dist. Cuyahoga No. 87429, 2006-Ohio-5253, ¶ 21, citing *State v. Parson*, 6 Ohio St.3d 442, 453 N.E.2d 689 (1983), syllabus.

{¶113} In this case, the trial had commenced, and in anticipation of the state's calling K.J. to testify, Kimmie objected, in part, to K.J.'s testimony. Specifically, Kimmie objected to K.J.'s pretrial identification on May 16, 2012, of Kimmie as the shooter. The state began to argue against Kimmie's objection, stating that when the Cleveland police initially showed K.J. a series of photographs, K.J. told the police that they had not shown her a picture of the shooter. In the course of arguing, however,

Detective Griffin informed the state that on May 16, K.J. had made an out-of-court identification of Kimmie as the shooter. Thereafter, the trial court permitted K.J.'s testimony concerning her pretrial identification.

{¶114} In order to determine whether the state violated the criminal rules of discovery in not providing K.J.'s pretrial identification, we must find that this evidence to which Kimmie objected is "favorable to the defendant." Crim.R. 16(B)(5); *State v. Smith*, 8th Dist. Cuyahoga No. 96348, 2011-Ohio-6466. K.J. testified that, on May 16, she positively identified Kimmie as the shooter from a photo array. This identification, therefore, is not favorable to the defense. *Wilson* at ¶ 19.

{¶115} Secondly, we must determine whether the evidence is "material either to guilt or punishment." Crim.R. 16(B)(5); *Smith*. The state did not present K.J.'s out-of-court identification at trial in order to prove Kimmie's guilt. Rather, K.J.'s pretrial identification was merely one evidentiary item presented at trial on behalf of the state. K.J. also made a positive in-court identification of Kimmie as the shooter. Moreover, K.J.'s in-court identification was cumulative to additional evidence presented by the state, which is further discussed under Kimmie's sixth assignment of error. We, therefore, cannot say that K.J.'s out-of-court identification was material to Kimmie's guilt or punishment or that the outcome of the trial would have been different had K.J.'s pretrial identification been prohibited. *Wilson*, 8th Dist. Cuyahoga No. 87429, 2006-Ohio-5253, at ¶ 20. As such, we find the state did not violate the rules of discovery concerning K.J.'s pretrial identification of Kimmie as the shooter.

**{¶116}** Even if we had found a violation, we cannot find that the trial court abused its discretion in allowing K.J.'s pretrial identification. First, there is no evidence that the state intentionally and willfully withheld evidence of K.J.'s pretrial identification, as the transcript reveals the state's initial discovery of the identification in the course of arguing against Kimmie's objection to K.J.'s testimony. Second, because the pretrial identification was not favorable to Kimmie, the prior knowledge of the identification would not have benefitted him in the preparation of his defense. Finally, Kimmie was not unfairly prejudiced by the out-of-court identification because K.J. positively identified him at trial. *See Wilson, supra* at ¶ 21-22.

**{¶117}** Accordingly, because we find that the trial court did not abuse its discretion concerning the admission of the NIBIN evidence, Raynell Williams's testimony, and K.J.'s pretrial identification, Kimmie's fourth assignment of error is overruled.

## V. Sufficiency of the Evidence

**{¶118}** Under his fifth assignment of error, Kimmie claims his conviction for murder and felonious assault is not supported by sufficient evidence. We disagree.

**{¶119}** When reviewing a challenge of the sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A sufficiency challenge requires us to review the record to determine whether the state presented evidence on each of the elements of the offense. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 1997-Ohio-52, 678 N.E.2d 541.

{¶120} Kimmie claims that there was insufficient evidence to convict him on the murder and the felonious assault charges because, by rendering a guilty verdict on reckless homicide as opposed to the aggravated murder charge, there was no evidence that Kimmie had the requisite knowledge to support the conviction on the murder charge. Further, Kimmie claims that the jury's verdict of guilty on the reckless homicide and guilty on the murder and the felonious assault charges was inconsistent.

{¶121} As noted earlier, under R.C. 2903.02(B), a person commits murder by proximately causing another's death while possessing the mens rea element set forth in the underlying felony offense. The underlying offense in this case is felonious assault: "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2). One acts knowingly, regardless of purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22(B). This

court has previously held that evidence that the defendant shot a gun into a crowd of people was sufficient to establish the purposefulness element of murder as defined by R.C. 2903.02(A). *Williamson*, 8th Dist. Cuyahoga No. 95732, 2011-Ohio-4095, at ¶ 19. Because proof of any degree of culpable mental state is sufficient to prove all lesser degrees, purpose is sufficient to prove knowledge. R.C. 2901.22(E).

{¶122} Here, Kimmie claims that he shot into the air four times; however, the evidence does not support his claim. Rather, the record contains evidence that Kimmie fired a gun in the direction of a crowd of people. Morgan testified that he saw a shooter in a red jacket "shooting at something." The victim, K.J., made in-court and out-of-court identifications of Kimmie as the shooter who was shooting toward Dillard Ave., not in the air. K.J. testified that she heard shots coming from Dillard Ave. going toward E. 38th St. and return fire from E. 38th St. toward the victims' location. Further, Detective Kooser, the firearms expert, examined the gun that the shooter with the red jacket threw at Morgan — "the Kimmie weapon" — and found that this gun had fired six shots.

{¶123} Moreover, while the jury found Kimmie guilty of reckless homicide in one count, requiring a reckless act, and guilty of murder and felonious assault in another count, requiring knowledge, it is well established in Ohio that consistency in the verdict is not required. In criminal cases, consistency between verdicts on several counts of an indictment is unnecessary "where the defendant is convicted on one or some counts, and acquitted on others." In such cases, the conviction will generally be upheld, "irrespective of its rational incompatibility with the acquittal." *State v. Sailor*, 8th Dist. Cuyahoga No.

83552, 2004-Ohio-5207, ¶ 88, citing *State v. Woodson*, 24 Ohio App.3d 143, 493 N.E.2d 1018 (10th Dist.1985).

{¶124} In light of the above, and in viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could find that Kimmie had the requisite knowledge sufficient to commit felonious assault and murder, regardless of its verdict on the reckless homicide. We find, therefore, that the state presented sufficient evidence to sustain Kimmie's convictions of murder and felonious assault. Accordingly, Kimmie's fifth assignment of error is overruled.

### VI. Manifest Weight

{¶125} Having concluded that the evidence on the record is sufficient to support a conviction of murder and felonious assault, we now review the record to determine whether Kimmie's convictions are against the manifest weight of the evidence.

{¶126} Unlike sufficiency of the evidence, manifest weight of the evidence raises a factual issue.

> "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Thompkins*, 78 Ohio St.3d at 387, 1997-Ohio-52, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 215, 485 N.E.2d 717.

{¶127} "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. When examining witness credibility, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). A factfinder is free to believe all, some, or none of the testimony of each witness appearing before it. *State v. Ellis*, 8th Dist. Cuyahoga No. 98538, 2013-Ohio-1184, ¶ 18.

{¶128} We find, in light of the record before us, that Kimmie's convictions are not against the manifest weight of the evidence.

{¶129} Morgan testified that he heard constant gunfire from E. 38th St., where he saw two or three shooters standing behind a van, leaning around the van and shooting into the crowd toward E. 39th St. and Dillard Ave., where the victims were located. Morgan testified that before retrieving the weapon, he screamed for the shooter in the red jacket to drop his weapon, which he did. Morgan then retrieved the weapon. Morgan testified that he saw this shooter run away, toward the Bivens courtyard. Tate testified that he saw two people near the same van — one person was "blindly firing into a crowd" and the other was holding a weapon. Tate testified that he first heard shots coming from E. 38th St. toward Dillard Ave. and there was return fire. Drummond testified that he saw a male with a red top running from the area.

{¶130} The red jacket, identified as state's exhibits Nos. 193 and 194, and this shooter's weapon were recovered, and both tested positive for Kimmie's DNA. Dr. Nasir Butt found that Kimmie was a "major contributor" of the DNA on the back strap of the gun. He also determined that Kimmie cannot be excluded as a possible contributor to the DNA found on the red jacket. The firearms expert testified that the recovered weapon, identified as the "Kimmie weapon," fired six shots out of the 30 recovered spent cartridges. Detective Griffin testified that there were two sets of people, or two locations, involved in a "shoot-out," as evidenced by the shell casings discovered in both locations. He stated that he recovered "numerous shell casings or bullets at E. 38th St. – Longwood Ave." and "maybe a couple" shell casings at Dillard Ave. – Longwood Ave.

{¶131} K.J., who was shot in the wrist, identified Kimmie from a police photo array prior to trial, and she identified Kimmie in court as the shooter. K.J. also testified that she heard shots coming from E. 38th St. and Dillard Ave. Lizaria Moore, who attended the party before the shooting with K.J. and Danica Nelson, testified that she heard gunshots come from an area where she saw a group of boys she did not know. Moore identified state's exhibits Nos. 193 and 194 as the jacket one of the boys in that group was wearing. Raynell Williams placed Kimmie at the scene prior to hearing gunfire.

{¶132} Finally, Kimmie provided a statement to the police following his arrest. In his own statement, Kimmie admitted that "the Valley Boys got to busting at us, so we

started shooting at them * * * I was shooting." He further stated that while he was shooting, he turned around and saw TD Security; he threw the gun on the ground, ran from security, and threw his red jacket near the parking lot. While Kimmie varied his statement to say that he shot four times in the air, this conflicting testimony rests solely with the jury and we may not substitute our judgment. The jury is free to believe all, some, or none of the testimony of each witness appearing before it.

{¶133} Having reviewed the entire record, we cannot say that this is one of the exceptional cases in which the evidence weighs heavily against Kimmie's conviction. Accordingly, Kimmie's sixth assignment of error is overruled.

## VII. Kimmie's Sentence

{¶134} Under Kimmie's final assignment of error, Kimmie contends that the imposition of consecutive sentences was contrary to law because the trial court did not make the statutory findings required by R.C. 2929.14(C)(4). He also contends that the court erred in imposing multiple sentences for allied offenses of similar important under R.C. 2941.25.

### Allied Offenses

{¶135} Kimmie argues that the shooting was a single act and, therefore, his convictions for murder and felonious assault should be deemed allied offenses and merged for sentencing. We disagree.

{¶136} R.C. 2941.25 provides as follows:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information

may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶137}** The Ohio Supreme Court established the proper analysis for determining whether offenses qualify as allied offenses subject to merger pursuant to R.C. 2941.25:

> In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct * * *. If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.
>
> If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind."

(Citations omitted.) *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶ 48-49.

**{¶138}** This court has previously held that "where a defendant commits the same offense against different victims during the same course of conduct and the offense is defined in terms of conduct toward another, then there is a dissimilar import for each person subjected to the harm or risk of harm." *State v. Phillips*, 8th Dist. Cuyahoga No. 98487, 2013-Ohio-1443, ¶ 10, citing *State v. Dix*, 8th Dist. Cuyahoga No. 94791,

2011-Ohio-472, ¶ 22. In *Phillips*, the charges arose from a drive-by shooting during which multiple shots were fired into a vehicle containing four occupants, a police chase ensued, and additional shots were fired. The defendant was charged with multiple counts of felonious assault and multiple counts of attempted murder. The court determined that "by firing multiple shots at an occupied vehicle, or acting in complicity with the shooter in this regard, appellant attempted to purposely cause the death of each victim." *Phillips*. Because he created a known risk of harm to four different people, there was separate animus as to each victim, and therefore, the offenses are not allied offenses of similar import. *Id.*[6]

{¶139} Likewise, in this case, Kimmie fired multiple shots into a crowd of people while engaging in a shoot-out. He acted in complicity with the other shooters and created a known risk of harm to the crowd of people caught in the middle of the gunfire, including the three victims. Kimmie's two felonious assault convictions pertaining to K.J. and James Willingham and his conviction for the murder of Danica Nelson are, therefore, not allied offenses of similar import.

<u>Consecutive Sentences</u>

{¶140} Kimmie also contends that the court erred in imposing consecutive sentences. The trial court sentenced Kimmie on November 2, 2012, to 15 years to life on

---

[6] In *State v. Sutton*, 8th Dist. Cuyahoga No. 90172, 2011-Ohio-2249, this court found that the act of shooting multiple, successive shots into an occupied vehicle was one act. However, in *Sutton*, we considered the offenses only as they related to each individual victim, not as they related to the multiple victims, finding that the trial court erred "in failing to merge the felonious assault and attempted murder convictions as to each of the four victims." *Id.* at ¶ 10; *Phillips* at ¶ 9.

Count 2, three years on Count 3, and three years on Count 4. The court ordered all counts to run consecutively and consecutive to the three-year firearm specification, for a total of 24 years to life.

{¶141} We review consecutive sentences using the standard set forth in R.C. 2953.08. *State v. Venes*, 8th Dist. Cuyahoga No. 98682, 2013-Ohio-1891, ¶ 8-10. That statute provides two grounds for an appellate court to overturn the imposition of consecutive sentences: (1) the sentence is "otherwise contrary to law"; or (2) the appellate court, upon its review, clearly and convincingly finds that the record does not support the sentencing court's findings under R.C. 2929.14(C)(4). *Venes* at ¶ 11; R.C. 2953.08(G)(2).

{¶142} H.B. 86, effective on September 30, 2011, revived the requirement that trial courts make certain findings before imposing consecutive sentences. *State v. Graves*, 8th Dist. Cuyahoga No. 98559, 2013-Ohio-2197, ¶ 11. Under current R.C. 2929.14(C)(4), when imposing consecutive sentences, the trial court must first find the sentence is "necessary to protect the public from future crime or to punish the offender." Next, the trial court must find that consecutive sentences are "not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." Finally, the trial court must find the existence of one of the three statutory factors set forth in R.C. 2929.14(C)(4)(a)-(c).

{¶143} Compliance with this statute "requires separate and distinct findings in addition to any findings relating to purposes and goals of criminal sentencing." *Venes* at

¶ 17, citing *State v. Jones*, 93 Ohio St.3d 391, 399, 2001-Ohio-1341, 754 N.E.2d 1252. "By stating the findings on the record, the reviewing court will not have to guess as to the trial court's thought process or impose its own. This helps the reviewing court to understand whether the trial court made the appropriate analysis." *State v. Davis*, 8th Dist. Nos. 97689, 97691, and 97692, 2012-Ohio-3951, ¶ 16 (Blackmon, J., concurring). The failure to make these findings is contrary to law. *Venes* at ¶ 12.

{¶144} In this case, in sentencing Kimmie for the murder, the trial court found that prison is necessary to protect the public from future crime and not demean the seriousness of the offense. In imposing a sentence for the two charges of felonious assault, the trial court reiterated the injuries to the victims and stated that "because of the nature of the offense, they are separate crimes, they should be separately punished, the court is imposing that time consecutively to one another." We find, however, that these statements, along with the record in this case, are devoid of the statutorily mandated findings required by the statute as outlined above. The consecutive sentence the trial court imposed, therefore, is clearly and convincingly contrary to law.

{¶145} Accordingly, we sustain Kimmie's seventh assignment of error as it relates to consecutive sentences and remand this case to the trial court for the limited purposes of resentencing consistent with R.C. 2929.14(C). The resentencing hearing on remand will be limited only to the issue found to be in error on appeal. *See State v. Huber*, 8th Dist. Cuyahoga No. 98206, 2012-Ohio-6139, ¶ 17.

{¶146} Affirmed in part; reversed in part.

**{¶147}** It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, JUDGE

MELODY J. STEWART, A.J., and
KATHLEEN ANN KEOUGH, J., CONCUR